

# Missouri Court of Appeals

## Southern District

### en banc

SYDNEY A. DURR,                              )
                                             )
            Appellant,                       )
                                             )
vs.                                          )        No. SD37212
                                             )        Filed:  May 5, 2022
CLARKS MOUNTAIN NURSING                      )
CENTER, AMERICARE SYSTEMS INC.,              )
and SAFETY NATIONAL CASUALTY                 )
COMPANY,                                     )
                                             )
            Respondents.                     )

### APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS COMMISSION

### **REVERSED AND REMANDED WITH DIRECTIONS**

Sydney Durr ("Durr") challenges the Labor and Industrial Relations Commission's ("the Commission") decision, which rejected her claim for workers' compensation benefits.  Durr argues in two points relied on that:  (1) the Commission erred in finding that Durr's injury did not arise out of her employment and that Durr was exposed to the same risk source in normal nonemployment life; and (2) the Commission erred in finding that closed-toed, non-skid shoes were recommended by Clark's Mountain Nursing Center ("Employer") but not required.  Finding merit to Durr's first point, we grant the same and reverse and remand the Commission's decision.

**Factual and Procedural History**

We recite the facts in accord with the Commission's fact-findings and credibility determinations. *See Annayeva v. SAB of the TSD of the City of St. Louis*, 597 S.W.3d 196, 200 (Mo. banc 2020). Here, the Commission premised its decision "*on the [Administrative Law Judge's ("ALJ")] factual findings alone*," and found Durr was not entitled to workers' compensation benefits because her injury did not arise out of her employment. (Emphasis added).[1] The Commission did not utilize its authority to make new factual findings. Therefore, we are required to limit our review to the factual findings and credibility determinations made by the ALJ.

In her award, the ALJ found, in part, that

[b]ased on all of the evidence presented, *including Employee's credible testimony*, I find that on March 5, 2015, the Employee sustained an accident. Employee sustained an unexpected traumatic event or unusual strain identifiable by time and place of occurrence and producing at the time objective symptoms of an injury caused by a specific event during a single work shift.

(Emphasis added).

Durr's credited testimony, in relevant part, reflects:

•Durr began working for Employer, as a certified nursing assistant ("CNA"), on February 5, 2015. Her shift began at 10:00 p.m. and ended at 6:00 a.m. As part of her regular job duties, she was required to assist residents with personal needs such as bathing, grooming, eating, refilling water pitchers, and transfers from bed to wheelchair. In performing her job, Durr wore closed-toed, non-skid shoes, which Employer recommended CNAs wear to avoid slips and falls. Durr did not wear these shoes at home.

•On March 5, 2015, Durr arrived at work and received her section assignment for the evening—this was the first time she had worked that section by herself.[2] She proceeded with her room check to ensure the 12 residents in her section were in their rooms and accounted for.

---

[1] The Commission's legal conclusion ignores some of the factual findings made by the ALJ, takes others out of context, then gives them an inappropriately expanded import to more narrowly define the risk hazard at issue in this case.

[2] The nursing center had four sections (sometimes referred to in the record as "hallways") that housed approximately 12 residents each. The four sections were broken down into two wings—the north wing containing two sections and the south wing containing two sections.

•Durr's job duties then required her to freshen each resident's pitcher with water and ice. Durr was to remove the resident's pitcher from the bedside table, go into the hallway where the water-ice cart was located, refill the pitcher, and return the pitcher to the resident's bedside table. The cart remained in the hallway for sanitary purposes. There was a "very quick[]" pace expected for filling pitchers, as there was only one water-ice cart provided by Employer, and this was to be shared with the other three sections.

•The residents' rooms were generally laid out in the same fashion, *i.e.* with the bedside table on the open side of the bed, with a few exceptions.

•Durr felt that an especially fast pace was expected the night of March 5, 2015, as she was required to do rounds with another CNA as soon as she finished with the water-ice cart. Durr was refilling the pitcher in her third room. The bedside table in this room had been moved to the side of the bed nearest the door, in a narrow space between the resident's bed and the wall that was about one foot in width. Employer placed the bedside table there in order to accommodate the resident's wheelchair, which was stored on the open side of the bed for the resident's easy access. The room was dark so the resident could sleep, and the only light in the room came from the hallway.

•Durr could not easily access the bedside table from the open side of the bed, as this would require her to reach across the sleeping resident, with the chance she could spill water on him or bump the bed and "spook[]" him. Instead, she needed to access the bedside table by stepping sideways through the one-foot narrow space between the bed and the wall. To exit the space, Durr needed to walk sideways to the foot of the bed, avoiding the bed's footboard, and then pivot to her right into the hall doorway.

•After Durr returned the pitcher to the bedside table, she reached the end of the bed and attempted to "turn with [her] right leg" but the "top of [her] left leg went with [her] body [and] the bottom of [her] left leg stuck" resulting in "a twisting motion of the knee." She immediately felt throbbing pain. She was able to slide to the floor and scoot the short distance into the hallway, where she was able to get the attention of a co-worker.

•Durr was assisted to the nurse's station where she received an ice pack. Durr requested that Employer call an ambulance, but Employer did not do so. Thereafter, Employer never provided Durr any medical treatment.

•The next day, Durr saw her family physician who recommended an MRI, physical therapy, and that she remain off work. The MRI revealed a "[t]ransient patellar dislocation with a medial patella prominent osteochrondal avulsion fragment displaced into the suprapatellar bursa" to the left knee. Durr ultimately had surgery to repair her left knee.

•Durr did not return to work after her surgery because she believed she no longer had enough strength in her left leg to lift residents into their wheelchairs, as this required her to "twist" her leg.

3

Bill Turner was Employer's administrator, and his testimony was that he was familiar with the room Durr was working in at the time of her injury, and it was "pretty typical of the rooms most of the time." However, he stated that residents were "allowed to arrange furniture in a way outside the standard layout in the room[,]" but that there were "safety issues that we always take into consideration, . . . because we may have to *go in that room in a hurry and it can't be cluttered up*." (Emphasis added). Turner testified that it was "important to maintain safety by making sure everything's arranged[.]"

Ashley Toelupe was the night shift charge nurse for Employer on the night of Durr's injury, and her (seemingly) credited testimony was that her job at that time was to supervise the CNAs and aides. Toelupe stated that on the evening Durr was injured, they had 60-70 residents and Durr had care of at least 12. She testified that it was "preferred" that CNAs finish their duties with the water-ice cart within two hours as the water-ice cart was shared by all four sections. She acknowledged that during this time period, the CNAs also had to respond to any needs of the residents that arose. She also testified that it was recommended that the CNAs wear closed-toed, non-skid shoes, to prevent slips and falls.

At Durr's request, she was evaluated by Dr. Dwight Woiteshek, who opined that Durr's work-related injury was the prevailing factor in the cause of the disability to her left knee and the subsequent need for the medical treatment she received.

Durr was also evaluated by Dr. Mahesh Bagwe, at the request of Employer, who opined that Durr's left knee injury and physical findings were consistent with her injury as described by Durr.

4

The ALJ concluded that:

The work activity described by Employee to each of her medical providers and both evaluating medical experts, was the risk which exposed her to the hazard of twisting and injuring her left knee. This risk is unrelated to any exposure outside of her employment in normal nonemployment life. I find that the injury to Employee's left knee did not come from a hazard or risk unrelated to her employment to which she would have been equally exposed outside of and unrelated to the employment in her normal nonemployment life.

I find there is a sufficient causal nexus between Employee's work activity and her resulting left knee injury. Passing out ice required Employee to move about in a tight, narrow space between the resident's bed and the wall to deliver fresh water and ice to his bedside table. Wearing the recommended non-skid shoes while navigating the tight, narrow space to deliver ice to the bedside and quickly turning to exit the confined space when her left non-skid shoe stuck to the floor caused the resulting twisting injury to her left knee. I find that the work accident of March 5, 2015 was the prevailing factor in causing Employee's left knee injury.

The Commission rejected the ALJ's award and denied workers' compensation benefits, in

relevant part finding that:

***Based on the ALJ's factual findings alone***, we do not believe that employee's alleged 2015 injury arose out of her employment at employer. Employee's testimony, at the very least, indicates that she ***may*** have been careless in performing her job duties at the time of her alleged 2015 injury. Employee testified that she tried to complete her job quickly. Ms. Toelupe testified that there was no time limit for passing ice, but noted that it was preferred that it be done within the first two hours of an employee's shift. Ms. Toelupe further testified that closed toed, non-skid shoes were recommended for employee's job, but were not required. Twisting and turning does not appear to be a condition of employee's employment or for the performance of her duties, and even if they were, employee, like every other human being, would have been exposed equally in normal non-employment life to twisting and turning during normal daily activities. We do not see a causal connection between employee's work duties and her alleged 2015 injury.

(Emphasis added).[3]

---

[3] The Commission did not find that Durr contributed to her injury, and instead found that she "***may*** have been careless" because she testified that she tried to complete her job in an expedient fashion (as Employer preferred), and that she was wearing the shoes recommended by Employer. (Emphasis added). The legal significance the Commission assigns to its finding that Durr "***may*** have been careless" is unclear, especially as it seemingly relies on the ALJ's fact findings. The Commission's conclusion that "[t]wisting and turning does not appear to be a condition of employee's employment or for the performance of her job duties[,]" and would have been equally exposed to "in normal non-employment life" are not facts contained in the ALJ's factual findings adopted by the Commission and thereby cannot support its denial of benefits.

This appeal followed. In two points relied on, Durr argues:

Point 1: The Commission erred when it misapplied the law and ruled that Employee's knee injury did not arise out of her employment because the facts found by the Commission do not support the award under Section 287.495.1(3)[4] in that the risk source of Employee's knee injury was inherent to the Employer's workplace and the conditions of her employment which included turning quickly within a narrow, confined space between the resident's bed and the wall approximately one foot in width together with her wearing of closed-toe, non-skid shoes she only wore at work. Employee's knee injury came from a hazard or risk unique to her employment and did not come from the general hazard or risk of twisting and turning to which she could have been equally exposed outside of and unrelated to her employment in normal non-employment life.

Point 2: The Commission erred in finding that closed-toe, non-skid shoes were recommended by employer *but were not required* and determining that since Employee was not required to wear those shoes, the shoes did not pose a risk source related to her employment and therefore Employee did not sustain an injury arising out of her employment, because the fact that the shoes were *not required* as found by the Commission is not supported by sufficient competent evidence in the record under Section 287.495.1(4) RSMo. in that the only evidence in the record which could support such a finding is inconclusive and the only evidence which directly answers the question of whether the specified shoes were required or optional was the uncontradicted testimony of Employee that the closed-toe, non-skid shoes were required to be worn as a condition of her employment with Employer.

(Emphasis in original).

## Analysis

### *Point I: Hazard or Risk Source*

In Durr's first point, she argues that the Commission erred in finding that Durr's knee injury did not arise out of her employment, and in finding that Durr was equally exposed to the same risk source in normal nonemployment life.

Section 287.020.3 directs that an injury "arise[s] out of and in the course of employment[,]" and "does not come from a hazard or risk unrelated to the employment to which workers would have been equally exposed outside of and unrelated to the employment in normal nonemployment

---

[4] All references to statutes are to RSMo Noncum.Supp (2014), unless otherwise indicated.

6

life." § 287.020.3(1)&.3(2)(b). Thus, "[f]or an injury to be deemed to arise out of and in the course of the employment under section 287.020.3(2)(b), the claimant employee must show a causal connection between the injury at issue and the employee's work activity." *Annayeva,* 597 S.W.3d at 199 (internal quotation and citation omitted).

The cases relied upon in the Commission's Award are distinguishable from the instant case. This is not a situation where claimant simply fell while walking at work, such as in *Annayeva*, 597 S.W.3d at 199 (no causal connection demonstrated where claimant slipped and fell on her way to class, and the only evidence that the condition of the floor contributed to her fall was claimant's *uncredited* testimony, and thus "her walk into school was no different from any other walk taken in her normal, nonemployment life."); *Johme v. St. John's Mercy Healthcare*, 366 S.W.3d 504, 507 (Mo. banc 2012) (no causal connection between work and injury where employee slipped off of her sandal while throwing away coffee grounds, because employee failed to demonstrate that she would not have been equally exposed to the risk of slipping off of her sandal in her normal non-employment life); *Miller v. Missouri Highway and Transp. Com'n*, 287 S.W.3d 671 (Mo. banc 2009) (no causal connection between work and injury where claimant was working on repairing a section of road and was "walking briskly toward [a] truck containing repair material" when he felt a "pop" in his knee and claimant was injured, but there was "nothing about the work [that] caused the injury.").

Moreover, Durr's work duties were not significantly attenuated from her injury, such as in *Schoen v. Mid-Missouri Mental Health Center*, 597 S.W.3d 657 (Mo. banc 2020) (no causal connection between work and injury where claimant was exposed to insecticide at work, reported to a doctor's office for evaluation, and another patient's dog got loose tripping claimant, causing the injury for which she sought compensation).

7

Finally, Durr was not injured because she was performing a task completely unrelated to her employment requirements as in ***Boothe v. DISH Network, Inc.***, 637 S.W.3d 45 (Mo. banc 2021) (where claimant failed to "establish that his injury's risk source [(eating while driving)] was related to his employment and that he was not equally exposed to that risk in nonemployment life[.]").

Rather, Durr's injury arose out of the particularized working conditions and work requirements of her job. The adopted ALJ finding was that *Employer* placed resident's bedside table in the one-foot gap between the wall and the bed, such that his wheelchair would not bump into the bedside table. It was Employer's preference that Durr wear closed-toed, non-skid shoes to prevent slips and falls. Moreover, it was part of Durr's job duties to fill residents' water pitchers in an expedient fashion, which required her to navigate the one-foot gap in a dark room,[5] and to pivot between facing forward and backward within that confined area. It was during (and because of) Durr's performance of this particularized job requirement that she was injured.

The dissent focuses too narrowly on the twisting and turning activity Durr was completing that caused her injury. The dissent overlooks that the twisting and turning was caused while Durr was performing her job duties required by the Employer.

Summarily, Durr was injured on the job, doing what she was supposed to do in the performance of her job duties when she turned and injured her knee. Her injury flowed from the particularized environment created by Employer, and she was wearing the shoes she was supposed to wear—non-skid shoes—which contributed to her injury. In short, Durr was doing her job as

---

[5] The adopted facts were that Durr had to go between the wall and the bed "[t]o get [the resident's] water pitcher because [she] didn't want to reach over him and stoop down or drop the water pitchers on him. . . . [H]is pitcher was on the other side of him and I have short arms and I didn't want to reach for it in case I accidentally spilled the pitcher on him or if I bumped the bed and spooked him because he was asleep."

8

expected at the time of her injury. The ALJ did not find that Durr was equally exposed to the same hazard or risk source in her every day nonemployment life.

The adopted facts found by the ALJ were that Durr was not equally exposed to this same risk in her "normal nonemployment life." *See* section 287.020.3.

Durr's Point I is granted, and the decision of the Commission is reversed and remanded for entry of an award consistent with the award entered by the ALJ. As our disposition of Point I is dispositive of this appeal, we need not reach Durr's Point II.

WILLIAM W. FRANCIS, JR., J. - OPINION AUTHOR

JEFFREY W. BATES, J. - Concurs

GARY W. LYNCH, C.J. - Concurs by Separate Concurring Opinion

DON E. BURRELL, J. - Concurs in the Separate Concurring Opinion

JACK A. L. GOODMAN, J. – Concurs in the Separate Concurring Opinion

JENNIFER R. GROWCOCK, J. – Concurs in the Separate Concurring Opinion

MARY W. SHEFFIELD, J. – Dissents in Separate Opinion



# Missouri Court of Appeals

### Southern District

#### en banc

SYDNEY A. DURR,                              )
                                             )
                    Appellant,               )
                                             )
vs.                                          )    No. SD37212
                                             )    Filed: May 5, 2022
CLARKS MOUNTAIN NURSING                      )
CENTER, AMERICARE SYSTEMS INC.,              )
and SAFETY NATIONAL CASUALTY                 )
COMPANY,                                     )
                                             )
                    Respondents.             )

### APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS COMMISSION

### <u>SEPARATE CONCURRING OPINION</u>

Neither the Commission's Final Award Denying Compensation nor the ALJ's Award is a

model of clarity in distinguishing between, on the one hand, the mere recital or summary of witness

testimony and, on the other hand, specific and expressed findings of fact on contested factual issues

based upon particular credited testimony.[1]  On the record before us, therefore, reasonable minds

---

[1] If the contested factual issue to be decided by the fact finder is whether X occurred, the factual finding that "witness testified that X occurred" is not necessarily a factual finding on that contested issue.  Rather, it is merely a recital of purported testimony.  A direct factual finding on the contested issue would be "X occurred."  An assessment of the credibility of the evidence may be stated as "witness credibly testified that X occurred."  Clearly, this finding is logically equivalent to a finding that "X occurred."  This logical clarity, however, is lost when, as here, purported summaries of witness testimonies are mislabeled as findings of fact or numerous recitals of witness testimony are interspersed with purported direct findings of fact with only non-specific or ambiguous credibility references.

1

may differ as to precisely where the Commission drew the line between the two when it generally adopted "the ALJ's factual findings." I disagree here and there with where the principle opinion draws that line in its Factual History section and with whether that line coincides with the Commission's line. Nevertheless, because the ultimate facts relied upon in its Analysis section and in reaching its result are supported by specific and expressed factual findings made by the ALJ and, therefore, adopted by the Commission, I concur in the principle opinion's analysis and result.

GARY W. LYNCH, C.J. - OPINION AUTHOR



# Missouri Court of Appeals

## Southern District

### en banc

SYDNEY A. DURR,           )
          )
          Appellant,      )
          )
vs.              )     No. SD37212
          )     Filed: May 5, 2022
CLARKS MOUNTAIN NURSING   )
CENTER, AMERICARE SYSTEMS INC.,  )
and SAFETY NATIONAL CASUALTY   )
COMPANY,         )
          )
          Respondents.    )

### APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS COMMISSION

### DISSENTING OPINION

I respectfully dissent. I would affirm the Commission's final award denying Durr's claim for workers' compensation benefits because Durr failed to demonstrate that the risk involved is not one to which she would have been equally exposed in normal nonemployment life.

Durr, as claimant, bore the burden of proof to show her injury was compensable under the Missouri Workers' Compensation Act (the "Act"). ***Annayeva v. SAB of TSD of City of St. Louis***, 597 S.W.3d 196, 199 (Mo. banc 2020). For an injury to be compensable under the

Act, it must arise out of and in the course of employment. *See* §§ 287.020.3; 287.120.1.[1] An injury is deemed to arise out of and in the course of employment only if:

> (b) It does not come from a hazard or risk unrelated to the employment to which workers would have been equally exposed outside of and unrelated to the employment in normal nonemployment life.

§ 287.020.3(2)(b).[2] Under that section, a claimant must show "a causal connection between the injury at issue and the employee's work activity" in order for an injury to arise out of and in the course of employment. *Johme v. St. John's Mercy Healthcare*, 366 S.W.3d 504, 510 (Mo. banc 2012). "When the relevant facts are not in dispute, the issue of whether an accident arose out of and in the course of employment is a question of law requiring *de novo* review." **Id.** at 509 (quoting **Miller**, 287 S.W.3d at 672).

In applying the causal connection requirement, our Missouri Supreme Court has repeatedly held that an injury is not compensable under the Act if it merely happened at work and the risk involved is one to which the worker would have been equally exposed in normal nonemployment life. *See* **Miller**, 287 3d at 674 (finding no causal connection between work activity and injury where claimant tore his meniscus while walking briskly at work with road crew to repair road); **Johme,** 366 S.W.3d at 511 (finding no causal connection between work activity and injury where claimant turned and twisted her ankle, or fell off her shoe while making coffee at work); **Annayeva**, 597 S.W.3d at 200 (finding no causal connection between work activity and injury where claimant slipped on floor at work).

The Commission found:

> . . . like every other human being, [Durr] would have been exposed equally in normal non-employment life to twisting and turning during normal daily activities. We do not see a causal connection between [Durr's] work duties, and her alleged 2015 injury.

---

[1] All statutory references are to RSMo (2014).
[2] "In 2005, the [A]ct was revised to provide that its provisions are to be construed strictly and to require the evidence to be weighed impartially without giving any party the benefit of the doubt." **Miller v. Missouri Highway and Transp. Comm'n**, 287 S.W.3d 671, 673 (Mo. banc 2009).

2

Here, the Commission's determination was not a misapplication of law because Durr failed to demonstrate the risk source was not one to which she was equally exposed in normal nonemployment life.  The facts demonstrate that after Durr reached the end of the bed and attempted to "turn with [her] right leg[,]" the "top of [her] left leg went with [her] body [and] the bottom of [her] left leg was stuck" resulting in "a twisting motion of the knee."  Essentially, she injured her knee while attempting to turn around at the base of a bed.  There was no unusual or increased *risk* in the performance of this work task that would not be equally present in normal nonemployment life.  The floor was not cracked or slippery and the task she was performing—pivoting around an object—was routine.  Durr was wearing the employer-recommended non-slip shoes, but there was no evidence that wearing those shoes increased the risk more than any other shoes Durr might have chosen to wear.  Durr testified she did not wear her non-slip shoes at *home* but presented no evidence of what shoes she wore in her *regular nonemployment life*.  Since the inherit risk in twisting and turning one's leg or pivoting to change directions to move around a bed is a risk to which the average person is regularly exposed, Durr did not satisfy the causal connection requirement.  The injury did occur at work while Durr was performing a work-related task, but the risk of the injury she sustained is a risk to which she would have been equally exposed in her normal nonemployment life.  For that reason, I would affirm the Commission's final award denying workers' compensation benefits to Durr.

MARY W. SHEFFIELD, J. – DISSENTING OPINION AUTHOR

3